USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9_|_25_/_18_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID ROBERT AITKEN,

Plaintiff,

- against -

AETNA LIFE INSURANCE COMPANY,

Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 4606 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff David Robert Aitken brings this action against Aetna Life Insurance

Company, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1001 et seq., claiming that Aetna erroneously denied him long-term disability benefits.

(Cmplt. (Dkt. No. 1)) The parties have cross-moved for summary judgment. (Dkt. Nos. 33, 38)

For the reasons stated below, the parties' cross-motions will be denied.

## BACKGROUND[1]

### I. PLAINTIFF'S EMPLOYMENT

From 2001 through 2005, and again from 2009 until November 2014 – when

Plaintiff allegedly became disabled – Plaintiff was employed as a Group Chief Financial Officer

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

("CFO") by Four Seasons Solar Products LLC ("Four Seasons"), at the company's offices in Holbrook, New York. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 45) ¶ 1; Administrative Record ("AR") at 969, 978)[2] Four Seasons is an international company that sells sunrooms (AR at 714), and is a subsidiary of Latium USA Holdings. (Def. R. to Pltf. R. 56.1 Stmt. (Dkt. No. 45) ¶ 1)

As Group CFO, Plaintiff earned $180,000 annually, and was responsible for, inter alia, day-to-day management of a $100 million budget for Four Seasons' Home Improvement Group; meeting strict reporting deadlines; supervising more than five direct reports and a department of more than twenty people; and attending multiple board meetings each month. (Id. ¶¶ 2, 4; AR at 714) Plaintiff's work as Group CFO involved a significant amount of travel, including trips to vendors, customers, and potential acquisition targets approximately two weeks each month; visiting a corporately owned retail location each month; travel to a Canadian subsidiary once a quarter; and travel to Four Seasons' parent company in the United Kingdom twice a year. (AR at 714) Plaintiff worked – on average – sixty hours a week. (Id. at 672) His job was "inherently stressful," and "at times [the stress] would be extreme." (Id. at 715)

## II. PLAINTIFF'S HISTORY OF CARDIAC DISEASE

Plaintiff has a history of coronary artery disease. (Id. at 662-63, 715) Plaintiff's cardiac symptoms began on May 29, 2012, when – at the age of 53 – he awoke in the middle of the night with discomfort and pressure in his chest. (Id. at 662, 715) Plaintiff's primary care doctor referred him to the Emergency Room, where he was treated by Dr. Cornell Cohen – a cardiologist. (Id. at 715, 830) Tests revealed that Plaintiff had a blockage of 80% or more in four of his arteries, and on June 1, 2012, Plaintiff underwent emergency triple bypass surgery.

---

[2] The Administrative Record was filed under seal.

(Id. at 663, 715)  Dr. Sandeep Gupta – a cardiothoracic surgeon – performed the bypass surgery. (Id. at 663, 715, 897)

After Plaintiff's triple bypass surgery, his health appeared to improve, and he returned to work on a part-time basis in August 2012. (Id. at 715)  On August 28, 2012, however, nurses noticed abnormalities on Plaintiff's heart monitor during cardiac rehabilitation, and an angiogram revealed that all of Plaintiff's cardiac grafts had either failed or were in the process of failing. (Id.; see also id. at 612, 663)  Accordingly, Plaintiff underwent a second emergency bypass surgical procedure on August 28, 2012. (Id. at 663, 915)

Plaintiff returned to work on a part-time basis six weeks after his second bypass operation, and he returned to full time work as Group CFO by the end of December 2013. (Id. at 716)  Plaintiff was still experiencing symptoms of reduced endurance and stamina; fatigue; headaches; and more frequent bouts of chest pain, however. (Id. at 716-17)  After Plaintiff experienced an episode of severe angina, he underwent a third angiogram on February 10, 2014, which revealed a blockage in the left anterior descending artery. (Id. at 717)  Doctors inserted a drug-eluting stent at the site of the blockage. (Id. at 663, 717)

Plaintiff returned to work as Group CFO after a brief recovery period, but stress from his job, frequent travel, and long work hours caused a progressive worsening of his symptoms. (Id. at 717-18)  According to Plaintiff, he experienced worsening fatigue, a lack of endurance, chest pain, nausea, sweating, and atrial fibrillation, all of which began interfering with his ability to perform his duties as Group CFO. (Id. at 717-18)

## III.  PLAINTIFF'S TRANSITION TO A NEW POSITION

Plaintiff states that "[a]s a result of [his] inability to handle the demanding and stressful nature of [his] occupation, [he] gave up the role of Group CFO for Four Seasons [] in

3

Nov[ember] 2014 and began working in an interim role as Director of Acquisitions, also for Four Seasons []." (Id. at 719) Plaintiff's last day as Group CFO was November 7, 2014, and he worked as Director of Acquisitions from then through May 2015. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 45) ¶¶ 16, 20) Plaintiff's position as Director of Acquisitions "was not stressful," and did not involve any managerial duties, significant travel obligations, or deadlines. (AR at 719)

On the day that Plaintiff became Director of Acquisitions, his salary was reduced to $100,000 per year. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 45) ¶ 18) On November 24, 2014, Plaintiff's attorney informed Aetna that, as of November 3, 2014, Plaintiff was "still at work but with restriction[s] and [a] reduced schedule." (AR at 403) Aetna subsequently learned from Plaintiff's employer that Plaintiff's "new job as Director of Acquisitions [was] on a full time basis at the beginning of November 2014," and that Plaintiff "was available for support to [the] new CFO as needed but no longer performing any of the CFO job duties." (Id. at 398) Plaintiff's employer also reported that Plaintiff's "salary was reduced to $60,000 as of [the] end of March 2015," and that, as of April 30, 2015, Plaintiff was "working less than 40 hours per week [] as Director of Acquisitions." (Id.)

Plaintiff moved to Virginia in June 2015, where he now works as an accountant for an independently owned and operated Four Seasons franchise. (Id. at 720)

## IV.   PLAINTIFF'S DISABILITY BENEFIT PLAN

As an employee of Four Seasons, Plaintiff had long-term disability ("LTD") insurance coverage under the Boston Insurance Employee Benefit Trust Long Term Disability Plan issued for Four Seasons' corporate parent, Latium USA Holdings (the "Plan"). (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 45) ¶ 5) Benefits under the Plan are provided by Aetna, pursuant

4

to its Group Life and Accident and Health Insurance Policy No. GP-617383-GI (the "Policy").

(Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 2)

For purposes of Plaintiff's disability claim, the Plan consists of the Policy, a

Certificate-Booklet, and a Schedule of Benefits. (Id. ¶ 7) The Plan grants Aetna discretion to

determine an employee's entitlement to benefits:

> Claim Determinations; ERISA Claim Fiduciary. . . . [Aetna] [is] a fiduciary with
> complete authority to review all denied claims for benefits under this Policy. . . .
> In exercising such fiduciary responsibility, [Aetna] shall have discretionary
> authority to determine whether and to what extent eligible employee and
> beneficiaries are entitled to benefits and to construe any disputed or doubtful
> terms under this Policy, the Certificate or any other document incorporated
> herein, [Aetna] shall be deemed to have properly exercised such authority unless
> [Aetna] abuse[s] [its] discretion by acting arbitrarily and capriciously.

(Id. ¶ 8)

The Plan's "Test of Disability" provides in relevant part: "You meet the test of

disability on any day that: You cannot perform the material duties of your own occupation

solely because of an illness, [or] injury . . . ; and [y]our earnings are 80% or less of your adjusted

predisability earnings." (AR at 1025 (emphasis removed)) The Plan defines "Own Occupation"

as

> The occupation that you are routinely performing when your period of disability
> begins. Your occupation will be viewed as it is normally performed in the
> national economy instead of how it is performed: For your specific employer; or
> [a]t your location or work site; and [w]ithout regard to your specific reporting
> relationship.

(AR at 1041) The Plan defines "Material Duties" as "[d]uties that: Are normally needed for the

performance of your own occupation; and [c]annot be reasonably left out or changed. However,

to be at work more than 40 hours per week is not a material duty." (Id. (emphasis removed))

5

## V.  PLAINTIFF'S DISABILITY CLAIM

Plaintiff submitted a claim for LTD benefits to Aetna on January 21, 2015, asserting that he became disabled on November 3, 2014. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 13) In considering Plaintiff's claim, Aetna reviewed a variety of contemporaneous medical records, including September 11, 2014 and October 1, 2014 progress notes from Plaintiff's cardiologist, Dr. Cohen. In the September 11, 2014 progress note, Dr. Cohen reported that Plaintiff's symptoms included chest pain, palpitations, and shortness of breath, and that Dr. Cohen was "concerned [about Plaintiff's] symptoms," because "[t]he recurrence of symptoms in the face of now 3 revascularizations [wa]s very alarming." (AR 835-37) Dr. Cohen also reported that Plaintiff's "breakthrough symptoms" were related to an "inability to tolerate an increase[d] stress load." (Id. at 837)

In the October 1, 2014 progress note, Dr. Cohen reported that "[Plaintiff] continues to have episodes of atrial fibrillation. He notes one episode lasted the better part of the entire night. He has been unable to sleep as he is symptomatic. . . . [These] [s]ymptoms include chest pain, hypertension, palpitations[,] and shortness of breath." (AR at 830-31) Dr. Cohen also reported that his "hope [wa]s to try to control the patient's atrial fibrillation. [Plaintiff] has been adequately revascularized and has shown so on recent nuclear stress test studies." (Id. at 833) Dr. Cohen also stated that he had "asked the patient [to] follow a low-salt, low-fat, and low-cholesterol diet," and "encouraged him to exercise regularly." (Id.) The September 11, 2014 and October 1, 2014 progress notes do not reflect a recommendation from Dr. Cohen that Plaintiff change his job. (Id. at 830-37)

Aetna also reviewed an October 13, 2014 record prepared by Michelle Craddock, a nurse practitioner who worked for Plaintiff's internist. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt.

No. 43) ¶ 24) Nurse Craddock reported that Plaintiff should "continue meds[;] follow up cardiology[; and] follow up [in] 3-4 months." (Id.)

Aetna also reviewed a report prepared by Plaintiff's cardiothoracic surgeon, Dr. Gupta, following a November 13, 2014 office visit. Dr. Gupta's record shows that Plaintiff said that he had "cut back work hours to 4 days a week to get in better physical shape." Dr. Gupta "agree[d] with [Plaintiff's] reduced work hours and recommended getting [a] trainer and nutritionist." (Id. ¶ 25; AR at 897) As noted above, however, Plaintiff was working full time in November 2014 (AR at 398; see also Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 30 (admitting that Plaintiff was working full time into December 2014), albeit less than the sixty hours per week he had been working as CFO. (See AR at 612)

Aetna also reviewed an Attending Physician's Statement from Dr. Gupta, dated December 23, 2014, which diagnosed Plaintiff with Coronary Artery Disease (id. at 984), and stated that Plaintiff was able to perform "light work activity[,] [e]xerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently." (Id. at 985) Dr. Gupta also wrote that Plaintiff could "work 4 days per week to build up patient's endurance, low stress job, little travel." (Id.) Plaintiff was working full time as of December 2014, however. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 30)

Dr. Cohen submitted an Attending Physician's Statement to Aetna, dated January 23, 2015, in which he diagnosed Plaintiff with Paroxysmal Atrial Fibrillation and Coronary Artery Disease (AR at 988) Dr. Cohen agreed that Plaintiff could perform "light work activity" (Id. at 989), and listed Plaintiff's restrictions/limitations as "[n]o heavy, strenuous activity, [n]o lifting heavy objects > 20 lbs, no pushing > pound[s]. No reaching overhead. No undue stress.

7

Limited travel." (Id.) Dr. Cohen also opined that "undue stress has affected [Plaintiff's] medical condition." (Id.)

Dr. Gupta and Dr. Cohen also completed Capabilities and Limitations Worksheets on December 23, 2014 and January 22, 2015, respectively. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶¶ 32-33) Dr. Gupta's worksheet reports, inter alia, that Plaintiff could engage in every listed vocational activity (including climbing, lifting, pulling, pushing, carrying, bending, twisting, sitting, standing and walking) "frequently," which means 34% to 66% of an eight-hour day. (Id. ¶ 32) Dr. Gupta also reported that Plaintiff could operate a motor vehicle, hazardous machinery, and power tools, and that Plaintiff had no limitations for exposure to heat, cold, dampness, noise, dust, fumes, chemicals or radiation. (Id.) He further reported that Plaintiff was able to work eight hours a day. (Id.)

Dr. Cohen's worksheet reports that Plaintiff could engage in all of the listed vocational activities "continuously," which means 67% to 100% of the day. (Id. ¶ 33) Dr. Cohen reported that Plaintiff could work eight hours per day, and that Plaintiff could operate a motor vehicle, hazardous machinery and power tools. (Id.) Unlike Dr. Gupta, however, Dr. Cohen stated that Plaintiff had exposure limitations to heat, cold, dampness, noise, dust, fumes, chemicals, and radiation. (Id.)

On February 2, 2015, an Aetna representative spoke by telephone with Plaintiff, who stated that his only disabling restriction/ limitation was "no heavy lifting." (AR at 398) Plaintiff also said that, "[f]rom February 2014 through November [he was] under a lot of pressure and [had a] heavy workload[,] and it was having [an] impact on his health. He developed atrial fib, chest pains, fatigue, sweats symptoms [sic] at work." (Id.) After this

8

February 2, 2015 call, Plaintiff's attorney told Aetna that it could not speak directly to Plaintiff, and that "[a]ll communication and requests for information need to go through the attorney's

Between March and April 2015, Eleanor Newton – a registered nurse and clinical consultant for Aetna – conducted multiple reviews of the medical records Aetna had received. (Id. ¶ 36) On March 20, 2015, Nurse Newton noted that the Capacities and Limitations Worksheets completed by Dr. Gupta and Dr. Cohen indicated that "[c]laimant has full time work capacity." (Id. ¶ 37) She also noted that "it appears that [Plaintiff] elected to reduce work hours. (Id.) On April 17, 2015, after reviewing additional medical records, Nurse Newton concluded that "[t]here is no clinical evidence of change in functionality since [the Attending Physician Statement] from C. Cohen, MD (cardio) dated 1/23/15[;] . . . no heavy or strenuous activity, no lifting heavy objects >20 lbs., no pushing > 10 pounds, no reaching overhead, no undue stress, limited travel. 8hours/day, 5days/week; undue stress has affected his medical condition. . . . Claimant has work capacity." (Id. ¶ 38)

On April 27, 2015, Aetna asked Janet Clifton – a vocational rehabilitation consultant – whether the restrictions and limitations as reported by Nurse Newton would prevent Plaintiff from "perform[ing] the material duties of his own occupation as Director of Acquisitions." (AR at 486) Clifton opined that the closest matching occupation in the U.S. Department of Labor's Dictionary of Occupational Titles is Sales Manager, a sedentary occupation. (Id. at 487) Clifton also reported that, according to the Department of Labor's Occupational Outlook Handbook, "[s]ales managers often are required to travel," and to "work full time" with "long hours." (Id. at 488) Clifton further reported that she "would not be able to comment on the stress level, per se, as this information would be more job-specific or employer-specific and can be subjective and not well-defined." (Id. at 487)

9

During its initial claim review, Aetna also received a January 6, 2015 letter from the chief executive officer of Four Seasons, Shaun Kennedy. Kennedy wrote:

> [Since Plaintiff] had a stent inserted [in February 2014] . . . , I have noticed a slow but noticeable decline in his work abilities. . . . When he is under significant stress, something that happens frequently in this role, his symptoms noticeably increase. For example, he fatigues quickly; often becomes nauseous and even physically ill while at the office; and he occasionally loses color in his face and turns white . . . . There were other times when [Plaintiff] had chest pains and angina that were so severe he was physically incapable of driving home. Having seen the consequences first hand I've been unable to ask him to travel to meetings and perform tasks that I previously would not have hesitated to allocate to him.

(Id. at 978)

In a May 12, 2015 letter, Aetna informed Plaintiff's lawyer that Plaintiff's claim for LTD benefits had been denied, stating: "Based on the results of our review, your client is able to perform the material duties of his own occupation of Chief Financial Officer within the restrictions and limitations provided." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 41)

## VI.   PLAINTIFF'S APPEAL

Plaintiff filed an administrative appeal on November 5, 2015. (Id. ¶ 42) In his appeal, Plaintiff agreed that his own occupation was sedentary, but asserted that it required "[d]ealing with very significant levels of stress and pressure," significant travel, and working long hours. (Id. ¶¶ 43-44) In support of his appeal, Plaintiff submitted an affidavit, letters from Dr. Gupta and Dr. Cohen, a vocational evaluation prepared by Dr. Charles Kincaid, Ph.D., and statements from various family members, friends, and co-workers. (See AR at 662-729)

### A.   Plaintiff's Submission

In his affidavit, Plaintiff claims that "gave up the role of Group CFO" in November 2014, due to his "inability to handle the demanding and stressful nature of [his]

10

occupation." (AR at 719) Plaintiff's affidavit does not indicate whether his doctors ever recommended that he switch jobs. (See id. at 713-20)

Dr. Cohen's November 3, 2015 letter states, however, that he "ask[ed] [Plaintiff] to seek reassignment or different employment to prevent further cardiovascular illness and disability":

[Plaintiff's] endurance has diminished. He is no longer able to continue his continue his extensive travel schedule related to work. I have advised him against frequent airplane travel, a heavy work schedule, and working [in] a high pressure environment.

For his long-term cardiovascular health, it is essential that he decrease his stress levels, workload, and travel schedule.

(Id. at 662)

Dr. Gupta's October 7, 2015 letter states: "I have seen [Plaintiff] on October 6, 2015. Due to his recent cardiac health I advised him not to do extensive air travel or maintain a high stress job." (Id. at 663)

Dr. Kincaid's October 20, 2015 vocational evaluation addresses Plaintiff's alleged needs to avoid stress and extensive travel. With respect to stress, Dr. Kincaid states that the "high stress levels and duties of [Plaintiff]'s former job position are representative of CFO positions in the U.S. labor market." (Id. at 683) Dr. Kincaid notes that, according to the American Institute of Stress, "heart attacks and sudden deaths befall individuals much more frequently after periods of acute stress, . . . and [] the prevalence of coronary disease increases for people with long-term stress." (Id. at 682) Dr. Kincaid further reports that, according to the University of Rochester Medical Center,

[t]he hormone cortisol is released in response to stress. Studies suggest that the high levels of cortisol from long-term stress can increase blood cholesterol, triglycerides, and blood pressure. These are common risk factors for heart

11

disease. Stress can also cause changes that promote the buildup of plaque
deposits in the arteries.

(Id. at 683) Dr. Kincaid concludes that Plaintiff's physicians had "dispensed recommendations

that coincide with the research above" by "medically restrict[ing] [him] from undue stress and

physical activity." (Id.)

> Dr. Kincaid further states that
>
> traveling is another activity that is contradindicated for [Plaintiff]. According to
> O*Net, which is one of the most comprehensive informational bases of
> occupational duties, the following is listed for Chief Executives: 'Deliver
> speeches, write articles, or present information at meetings or conventions to
> promote services, exchange ideas, or accomplish objectives.' Meetings and
> conventions often require traveling domestically and internationally across time
> zones, and [Plaintiff] confirmed that he was required to travel frequently for his
> work as a Group Chief Financial Officer. Due to these issues, [Plaintiff]'s ability
> to return to his past work is highly unlikely.

(Id. at 684)

> Dr. Kincaid concludes, based on the "physical functional limitations derived from

the medical records reviewed for []his evaluation, [that] it is within a reasonable degree of

vocational certainty that [Plaintiff] is unemployable in his past work as a Group Chief Financial

Officer or similar stress-producing occupations due to his medical restrictions." (Id. at 692) In

reaching this conclusion, Dr. Kincaid opines that the "vocational-medical analysis of [Plaintiff]

prepared by Aetna lacks validity," because, inter alia, Aetna should have conducted a vocational

review based on the job responsibilities associated with the occupation of Controller, which Dr.

Kincaid determined was the closest matching occupation for Plaintiff's occupation as Group

CFO. (See id. at 687-90) According to the Dictionary of Occupational Titles, the duties of a

Controller are as follows:

> Directs financial activities of organization or subdivision of organization:
> Prepares, using computer or calculator, or directs participation of, reports which
> summarize and forecast company business activity and financial position in areas

12

of income, expenses, and earning, based on past, present, and expected operations. Directs determination of depreciation rates to apply to capital assets. Establishes, or recommends to management, major economic objectives and policies for company or subdivision. May manage accounting department. May direct preparation of budgets. May prepare reports required by regulatory agencies. May advise management on desirable operational adjustments due to tax code revisions. May arrange for audits of company accounts. May advise management about property and liability insurance coverage needed.

(Id. at 687)

## B. Dr. Veneziano's First Report

In reviewing Plaintiff's appeal, Aetna asked Marc Veneziano, M.D., who is board-certified in cardiovascular disease, to review the medical evidence. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 46) Prior to drafting his report, Dr. Veneziano called Dr. Cohen and Dr. Gupta several times. (Id.) Dr. Cohen did not return these calls, however, and Dr. Gupta's office told Dr. Veneziano that Dr. Gupta "[d]oes not wish to comment further on this case." (Id.)

In his report, Dr. Veneziano opines on Plaintiff's alleged need to avoid stress and extensive travel. (Id. ¶¶ 48-50) As to travel, Dr. Veneziano states: "I simply see no basis for stating [that] a man with cardiac disease which has been stable, based on stress testing and angiography, should not travel. . . . Recommendations like 'avoid "excessive" air travel' are too vague and, without a specific supporting reason and evidence, appear to be without foundation. It seems incongruous that [Plaintiff] can perform [well] on a treadmill, golf, drive a car and even operate heavy machinery, but cannot sit in an airplane or walk through an airport." (AR at 632)

As to stress, Dr. Veneziano states that

[b]oth Dr. Cohen and Dr. Gupta express a belief that Mr. Aitken's job hinders his symptomatic improvement and increases his risk for future events. While removal of stress and devoting more time to a healthy life-style may theoretically help Mr. Aitken's cardiovascular health, based on his doctors' notes where Mr. Aitken consistently acknowledges he is not exercising as instructed nor losing weight as instructed, Mr. Aitken does not seem to be actually making any progress in that area. . . .

13

(Id.) Dr. Veneziano notes that Aitken had gained fifty pounds since his second bypass surgery, and he opines that the additional weight is "a large burden on his heart that is likely contributing to his symptoms . . . ." (Id. at 634) Dr. Veneziano concludes that Plaintiff's "prognosis for improvement in his functional capacity is good, provided he actively participate[s] in his own care. The medical record demonstrates that [Plaintiff] has not followed his doctors' instructions regarding weight loss and exercise." (Id.)

## C.     Dr. Cohen's Response to Dr. Veneziano's Report

Aetna sent a copy of Dr. Veneziano's report to Dr. Cohen and stated, "if you disagree with the reviewer's conclusions, please respond by indicating which areas of the attached report you agree with, which areas you disagree with, and any clinical evidence or observations in support of your opinion that have not already been provided." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 51)

In a February 3, 2016 letter, Dr. Cohen states that Plaintiff's symptoms had improved since November 2014, when he "changed jobs . . . to a less demanding role," and that Plaintiff "appears to have benefitted from transitioning to a role that involves considerabl[y] less stress." (AR at 612) Dr. Cohen acknowledges that Aitken had gained a substantial amount of weight since his second bypass operation, and agrees that Aitken "would undoubtedly benefit from losing some weight." (Id.) Dr. Cohen notes that the weight gain is only 30 pounds, however, and that Plaintiff's medications have "significant[ly] slowed his metabolism[,] making it difficult for him to lose weight." (Id.) Dr. Cohen further opines that the added weight is not "contributing to [Plaintiff's] physical limitations." (Id.) Dr. Cohen also states that Plaintiff reported that he had "made significant changes to his diet and has undertaken light exercise that includes regular walking, golf and gym activities." (Id.) Dr. Cohen also notes that, because the

14

failure of Aitken's grafts was discovered while he was undergoing cardiac rehabilitation, Aitken has developed serious reservations about "more vigorous exercising." (Id.)

Dr. Cohen reiterates his previous findings that Aitken "can physically sit at a desk and work for 8 hours a day," but concludes that "he cannot work as a Group CFO, which involve[s] a heavy workload and high stress/ pressure environment." (Id.) The basis for Dr. Cohen's conclusion is that, "[w]hen [Plaintiff] was working as Group CFO, his symptoms were significantly worse, which [Dr. Cohen] attribute[s] largely to the stress of the job." (Id. at 613)

Dr. Cohen further states that he restricts Aitken from "extensive or frequent airplane travel" because he "reported his worst episodes of atrial fibrillation, exhaustion, headaches and nausea after he undertook extensive airplane travel. His symptoms were made worse by traveling between multiple time zones, and then working after such flights without a sufficient recovery/rest period." (Id.) Based on this experience, Dr. Cohen concludes that Aitken "cannot be required [to] travel and then return to work right away. He needs some recovery time – which, according to [Plaintiff], was not possible while working as Group CFO." (Id.)

## D.    Dr. Veneziano's Second Report

Dr. Veneziano reviewed Dr. Cohen's response and concluded that there was "nothing within [it] that supports that Mr. Aitken is unable to travel, nor that he required any additional restrictions beyond what was put forward in my review dated 1/18/2016." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 58) Dr. Veneziano added: "Dr. Cohen points out that Mr. Aitken underwent cardiac catheterization on 3/16/2015 as a result of angina; this occurred nearly 4 months AFTER Mr. Aitken had already left his job as CFO. This suggests that Mr. Aitken's symptoms were not, in fact, job related. It is notable that Mr. Aitken had not undergone such

15

testing prior to leaving his job, when Dr. Cohen states Mr. Aitken's symptoms were 'more

severe." (Id. (emphasis in original))

Dr. Veneziano's second report also states that

[w]hile Dr. Cohen's description of Mr. Aitken's anxiety over exercising is
certainly plausible, it does not negate the fact that weight loss and increased
exercise would be expected to improve Mr. Aitken's functionality and symptoms
at least as much as "avoiding stress." The increased cardiac work needed to carry
around 30 (or 50) extra pounds is not insignificant and cannot be discounted as
failing to contribute to Mr. Aitken's symptoms.

(Id. ¶ 59) Dr. Veneziano also opines that, "[g]iven Dr. Cohen's statement that [Plaintiff] has

been 'deeply affected' by the possibility of an adverse cardiac event with physical stress, . . . the

question must be raised whether [Plaintiff]'s symptoms related to 'stress' and 'travel' are more

anxiety related than ischemia related." (Id. ¶ 60)

As to Plaintiff's "having some of his most severe symptoms of fatigue while

traveling and having little time to recuperate," Dr. Veneziano states that

this is certainly possible but still amounts to a purely subjective complaint. There
is no evidence within the medical record that Mr. Aitken suffered any actual harm
from travelling or that he was, in fact, physically incapable of doing so.
Additionally, medication adjustments, changes in sleep schedule and even timing
of flights and meetings could conceivably help Mr. Aitken tolerate travel better.

(Id. ¶ 61)

With respect to restrictions/limitations that are medically supported, Dr.

Veneziano agrees with Dr. Cohen that Plaintiff could work a full eight-hour day, drive, and

perform other typical vocational tasks. (Id. ¶ 62) As in his initial report, however, Dr.

Veneziano finds that Dr. Cohen's restriction on air travel is "without foundation." (Id. ¶ 63) He

repeats that "[i]t seems incongruous that Mr. Aitken can perform [well] on a treadmill, golf,

drive a car and even [according to Dr. Cohen] operate heavy machinery, but cannot sit in an

airplane or walk through an airport. There is no evidence in Dr. Cohen's reply that contradicts

16

this. . . ." (Id. ¶ 63) Finally, Dr. Veneziano reiterates his prior determination that Plaintiff's failure to follow his doctors' instructions and recommendations plays a role in his functional capacity. (Id. ¶ 64)

## E. Aetna's Determination

In a February 11, 2016 letter, Aetna denied Plaintiff's appeal. (Id. ¶ 65) After summarizing the medical evidence and Dr. Veneziano's views, Aetna concludes that, "[a]lthough Mr. Aitken has a history of [coronary artery disease,] there is a lack of clinical findings . . . to support his inability to work at his own occupation as a Group CFO [or] as a Director of Acquisitions." (Id. ¶ 66) Aetna further concludes that "Mr. Aitken is capable of working eight (8) hours per day, and [that] there is no documentation to support why Mr. Aitken [] is restricted from traveling." (Id. ¶ 67) Aetna comments that "[w]hile Dr. Cohen's description of Mr. Aitken's anxiety over exercising is certainly plausible, it does not negate the fact that weight loss, and increased exercise would be expected to improve Mr. Aitken's functionality, and symptoms at least as much as 'avoiding stress.'" (Id. ¶ 68) Aetna also notes that there is no evidence that Plaintiff was "treating for anxiety." (Id.)

Aetna finds that "Mr. Aitken can perform at a sedentary physical demand level." (Id. ¶ 69) Aetna concludes that, given that both of Plaintiff's occupations (Group CFO and Director of Acquisitions) "are considered sedentary in physical demand[,] . . . [and] based on the above restrictions and limitations, Mr. Aitken could perform both occupations." (Id. ¶ 70)

\*     \*     \*     \*

The Complaint was filed on June 17, 2016, and alleges that Plaintiff is entitled to LTD benefits under the Plan. (Cmplt. (Dkt. No. 1)) The parties have cross-moved for summary judgment. (Dkt. Nos. 29, 35)

17

## DISCUSSION

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that that party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, this Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (citations omitted). "'[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Instead, the non-moving party must "'offer some hard evidence showing that its version of the events is not wholly fanciful.'" Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

18

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993); Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

"It is appropriate for courts reviewing a challenge of denial of benefits under ERISA to do so on a motion for summary judgment, which 'provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record.'" Ramsteck v. Aetna Life Ins. Co., No. 08-CV-0012 (JFB) (ETB), 2009 WL 1796999, *6 (E.D.N.Y. June 24, 2009) (quoting Gannon v. Aetna Life Ins. Co., No. 05 Civ. 2160 (JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007)).

## II. STANDARD OF REVIEW

Under ERISA, courts review a denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the benefit plan grants the administrator such discretion, courts ordinarily "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." Hobson v.

Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (internal quotation marks and citation omitted).

> That rule is subject to an exception, however, under which

> a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed <u>de novo</u> in federal court, unless the plan has [1] otherwise established procedures in full conformity with the regulation and [2] can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent <u>and</u> harmless.

Halo v. Yale Health Plan, 819 F.3d 42, 57-58 (2d Cir. 2016) (emphasis in original) (rejecting a "substantial compliance" standard as "inconsistent with the Department [of Labor's] regulation," and holding that a plan must "strictly adhere to the regulation to obtain the more deferential arbitrary and capricious review"). "[T]he plan bears the burden of proof on this issue[,] since the party claiming deferential review should prove the predicate that justifies it." Id. at 58 (internal quotation marks and citations omitted).

Here, it is undisputed that the Plan grants Aetna discretionary authority. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 8) Plaintiff contends, however, that the denial of his claim for LTD benefits should be reviewed de novo, because Aetna "failed to comply with ERISA's procedural requirements set forth in 29 C.F.R. § 2560.503-1, and its lack of compliance was neither inadvertent nor harmless." (Pltf. Br. (Dkt. No. 39) at 12) According to Plaintiff, Aetna did not (1) render a decision within 45 days, in violation of 29 C.F.R. § 2560.503-1(i)(1)(i) and (i)(3)(i); and (2) review all of the documents submitted with Plaintiff's appeal, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv) and (h)(4). Because the Court finds that Aetna violated both Section 2560.503-1(i) and Section 2560.503-1(h), and that these violations were not inadvertent and were not harmless, it will review Plaintiff's claim de novo.

## A.    Aetna's Violation of 29 C.F.R. § 2560.503-1(i)

### 1.    The Time Limit Regulation

29 C.F.R. § 2560.503-1(i) requires a plan administrator to decide a claimant's disability benefits appeal within 45 days of submission. 29 C.F.R. § 2560.503-1(i)(1)(i), (i)(3)(i). The plan administrator is, however, allowed an additional 45 days to issue a decision, if it determines that "special circumstances . . . require an extension of time for processing the claim." 29 C.F.R. § 2560.503-1(i)(1)(i), (i)(3)(i). If the plan administrator concludes that special circumstances necessitate an extension, the administrator must notify the claimant in writing of the extension, and state why it requires the additional time. 29 C.F.R. § 2560.503-1(i)(1)(i). The Department of Labor's regulations note that "the need to hold a hearing, if the plan's procedures provide for a hearing," might be a special circumstance, but do not otherwise define special circumstances. 29 C.F.R. § 2560.503-1(i)(1)(i).

### 2.    The Circumstances of Aetna's Extension of Time

Aetna received Plaintiff's appeal on November 5, 2015 (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No 45) ¶ 68), and in a December 18, 2015 letter – forty-three days later – Aetna informed Plaintiff that it "need[ed] more time [to review the appeal,] because [it was] in the process of referring [Plaintiff's] claim file for a specialty matched medical opinion." (AR at 259) On January 25, 2016 – eighty-one days after Aetna received the appeal – Plaintiff's attorney requested that the appeal be placed on hold until February 3, 2016, to allow Dr. Cohen to review "a report sent to him on January 21, 2016," and to "provide supplemental clinical information in response to that report if applicable." (Id. at 261) Aetna granted Plaintiff's request for an eight-day hold (id.), and decided Plaintiff's appeal on February 11, 2016 (id. at

262) – exactly ninety days after Aetna received the appeal, if one includes in the calculations the eight-day hold. (Id.)

### 3. Analysis

"There is limited authority addressing what constitutes 'special circumstances'" for the purposes of the claims procedure regulation.[3] Hafford v. Aetna Life Ins. Co., No. 16-CV-4425 (VEC) (SN), 2017 WL 4083580, at *5 (S.D.N.Y. Sept. 13, 2017); see also Salisbury v. Prudential Ins. Co. of Am., 238 F. Supp. 3d 444, 449 (S.D.N.Y. 2017) ("Unfortunately, neither party cites any cases providing insight into the meaning of 'special circumstances' under 29 C.F.R. § 2560.503–1, and the Court's independent research revealed no applicable precedent.")

In Salisbury, the court held that an extension "to allow for review of the information in [the plaintiff]'s file which remains under physician and vocational review" did not present a special circumstance. Salisbury, 238 F. Supp. 3d at 446, 450. The court reached that conclusion after reviewing the preamble to the claims procedure regulation, which the Second Circuit has stated "'is entitled to substantial deference.'" Id. at 449 (quoting Halo, 819 F.3d at 53). The Salibury court observed that the preamble states that "'the time periods for

---

[3] Citing the Tenth Circuit's decision in Holmes v. Colo. Coal. for the Homeless LTD Plan, 762 F.3d 1195 (10th Cir. 2014), Aetna contends that this Court should defer to its determination that special circumstances existed. (See Def. Opp. (Dkt. No. 44) at 8 (citing Holmes, 762 F.3d at 1206) ("[T]he plan administrator [has] sole discretion to determine whether special circumstances exist requiring an extension of time for decision.")) In this Circuit, however, "when a court is 'called on to judge [a plan's] compliance with the applicable statute and regulations . . . [the court] owe[s] the plan administrator no deference. The interpretation of ERISA, a federal statute, is a question of law subject to de novo review.'" Cohen v. New York Cmty. Tr. Ret. Plan, No. 12 CIV. 9085 PAE, 2013 WL 3226962, at *3 (S.D.N.Y. June 26, 2013) (quoting Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 581 (2d Cir. 2006) (alterations in Cohen)); Hafford, 2017 WL 4083580, at *5 n.2 ("[T]he Second Circuit has held that interpretation of the Department of Labor's regulations is a question of law for the Court."). Accordingly, the Court will not defer to Aetna's determination that special circumstances exist.

decisionmaking are generally maximum periods, not automatic entitlements,'" and that "'an extension may be imposed only for reasons beyond the control of the plan.'" Id. (quoting ERISA Rules & Regulations for Admin. & Enforcement, Claims Procedures ("Preamble"), 65 Fed. Reg. 70,246, 70,250 (Nov. 21, 2000)). The court also noted that the preamble "suggested that simply having too much work does not constitute an acceptable justification" for an extension. Id.; see also Preamble ("[D]elays caused by cyclical or seasonal fluctuations in claims volume [are not] matters beyond the control of the plan that would justify an extension."). Based on the preamble's guidance, the court concluded that the administrator's proffered special circumstance was insufficient, because "virtually every appeal of the denial of a disability benefits claim will require 'physician and vocational review.'" Id. at 450. The court also emphasized that the "written notice of extension did not identify any unusual difficulties associated with [the plaintiff's] claim." Id.

In Hafford, the court found "Salisbury to be instructive" but distinguished it on its facts, because the administrator in Hafford "required more time [due to] issues that [we]re not a part of an ordinary appeal and [] were not caused by [the administrator]." Hafford, 2017 WL 4083580, at *5. The administrator in Hafford

> had tried over the course of several weeks to set up a second FCE [functional capacity evaluation] so that it could fully evaluate [the plaintiff]'s claim, but [] was unsuccessful because [the plaintiff] had moved to a remote area in northern Maine where there were few facilities capable of performing an FCE. The fact that [plaintiff] had moved to a rural area with limited medical facilities and that restrictions on his activity made it difficult to perform a complete FCE were not circumstances within [the administrator's] control. Moreover, that a second FCE was necessary to process [the] appeal was itself a result of circumstances beyond [the administrator's] control and outside the ordinary course of business in processing an appeal. Although [plaintiff's] claim was denied in October 2013, [plaintiff] did not appeal for more than a year, eventually filing in January 2015, approximately eight months after the deadline and more than a year after the denial. Because of the delay, [plaintiff's] records were stale and required updating.

23

Id.

The facts in the instant case are far more similar to Salisbury than Hafford. Here, forty-three days after receiving Plaintiff's administrative appeal, Aetna notified Plaintiff that it "need[ed] more time [to review the appeal] because [it was] in the process of referring [Plaintiff's] claim file for a specialty matched medical opinion." (AR at 259) As the Court observed in Salisbury, "virtually every appeal of the denial of a disability benefits claim will require 'physician . . . review.'" Id. at 450. Accordingly, Aetna's desire for a specialty matched medical opinion does not present an extraordinary circumstance. Indeed, it seems likely that in any case alleging disability premised on coronary artery disease, Aetna would want its own expert to review the claim. Moreover, Aetna's December 18, 2015 notice of extension letter does "not identify any unusual difficulties associated with [Plaintiff's] claim." Id. The Court concludes that the extension here was not justified by a special circumstance.

Aetna contends, however, that if Plaintiff "believed that Aetna did not have a basis on December 18, 2015 to extend its time to decide the appeal," then he "should have so notified Aetna [at that time]." (Def. Opp. (Dkt. No. 44) at 10) Aetna has not cited any authority suggesting that a claimant has a burden to object contemporaneously to an extension, however, and such a rule would be inconsistent with the Second Circuit's holding in Halo. See Halo, 819 F.3d at 58 (holding that "the plan bears the burden of proof" of demonstrating that it complied with ERISA regulations).

Aetna also contends that de novo review is unwarranted because, "[e]ven if the December 18, 2015 letter had been inadequate, it is undisputed that plaintiff requested [on January 25, 2016] that Aetna delay its determination further, and [that] Aetna agreed to do so." (Def. Opp. (Dkt. No. 44) at 9) According to Aetna, "Plaintiff's attorney cannot accept an

24

extension letter without comment or complaint, then ask for a further extension, and then contend that the initial extension was invalid." (Id.) The fact that Plaintiff requested an eight-day hold long after Aetna gave notice of a 45-day extension has no bearing on whether Aetna's 45-day extension was justified by special circumstances, however.[4] See Montefiore Med. Ctr. v. Local 272 Welfare Fund, No. 14-CV-10229 (RA), 2017 WL 1194704, at *3 (S.D.N.Y. Mar. 31, 2017) ("Halo held that if the plan administrator does not strictly comply with the Department of Labor's regulation governing the processing of an employee's claim, then de novo review applies . . . .") (internal quotation marks and citation omitted), aff'd, 712 F. App'x 104 (2d Cir. 2018).

Having concluded that Aetna violated the time limit regulation – 29 C.F.R. § 2560.503-1(i) – the Court must next consider whether the exception announced in Halo

---

[4] Aetna cites Wedge v. Shawmut Design and Constr. Grp. Long Term Disability Ins. Plan, No. 12 Civ. 5645 (KPF), 2013 WL 4860157 (S.D.N.Y. Sept. 10, 2013), in support of its argument that it did not violate the claims procedure regulation. (Def. Opp. (Dkt. No. 44) at 10) In Wedge, the court found that a plan administrator's untimely decision concerning plaintiff's appeal did not violate ERISA regulations. Wedge is a pre-Halo case, however, and applies a much more forgiving standard. See Wedge, 2013 WL 4860157, at *11 ("[C]ourts review the record of the dealings between the claimant and the plan administrator to ensure that the parties acted in good faith, with consideration of the relevant regulatory deadlines and without dilatory intent."). The standard applied in Wedge is not consistent with Halo's demand that a plan "strictly adhere to the [claims procedure] regulation to obtain the more deferential arbitrary and capricious review." Halo, 819 F.3d at 57-58. Accordingly, Wedge is not persuasive here. In any event, Wedge is distinguishable on its facts. In that case, "some of the delay was attributable to [p]laintiff's efforts at negotiating conditions precedent to appearing for an [independent medical examination]," which the plan administrator requested only three weeks after plaintiff filed his appeal. Id. at *2, *9. Here, Aetna's delay is not attributable in any way to Plaintiff's actions.

Aetna's reliance on Young v. Hartford Life & Acc. Ins. Co., No. 09 CIV. 9811 RJH, 2011 WL 4430859 (S.D.N.Y. Sept. 23, 2011), (see Def. Opp. (Dkt. No. 44) at 10), is likewise misplaced. The issue in Young is whether the insurer retained a properly credentialed doctor to review plaintiff's claim on appeal, not whether the appeal was timely decided. See Young, 2011 WL 4430859, at *12.

applies. As discussed above, a plan administrator may avoid <u>de novo</u> review if "the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent <u>and</u> harmless." <u>Halo</u>, 819 F.3d at 58 (emphasis in original).

Here, the exception does not apply, because Aetna has not shown that the violation was inadvertent. As the <u>Salisbury</u> court concluded, an unjustified extension is not "inadvertent" where, as here, the administrator "purposefully sought the extension and provided [] inadequate grounds for seeking an extension." <u>Salisbury</u>, 238 F. Supp. 3d at 451.

Accordingly, Aetna's determination concerning Plaintiff's appeal is subject to <u>de novo</u> review. <u>Halo</u>, 819 F.3d at 57-58.

## B. Aetna's Violation of 29 C.F.R. § 2560.503-1(h)

### 1. The "Consideration of Relevant Materials" Regulation

29 C.F.R. § 2560.503-1(h)(2)(iv) applies to disability benefit plans through Section 2560.503-1(h)(4), and requires that an "[a]ppeal of adverse benefit determinations . . . (iv) [p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). Where a claimant alleges that a plan administrator violated Section 2560.503-1(h)(2)(iv), the administrator "bear[s] the burden to show that [its] determination is consistent with the claims procedures regulations" through "affirmative evidence that the appellate reviewer" considered the materials at issue. <u>Schuman v. Aetna Life Ins. Co.</u>, No. 3:15-CV-1006 (SRU), 2017 WL 1053853, at *16 (D. Conn. Mar. 20, 2017).

26

## 2. **Analysis**

Plaintiff contends that Aetna violated 29 C.F.R. § 2560.503-1(h), because "[t]here is absolutely no evidence" that Aetna considered Dr. Kincaid's vocational report. (Pltf. Br. (Dkt. No. 39) at 12) In response, Aetna cites portions of the administrative record as "evidence" that Dr. Kincaid's vocational report "was considered." (Def. Opp. (Dkt. No. 44) at 11-12) None of Aetna's citations demonstrates that it took Dr. Kincaid's report "into account," however.

For example, Aetna cites to a "November 11, 2015 Strategic Claim Discussion, in which five Aetna employees participated, [] discuss[ed] [] [P]laintiff's attorney's assertion that Aetna had not analyzed [P]laintiff's occupation accurately, and resolved 'to clarify the vocational information as it pertains to the attorney's concerns.'" (Id. at 11 (citing AR at 506-10)) The fact that these Aetna employees "resolved" to investigate Plaintiff's contention that Aetna had not considered Dr. Kincaid's report does not constitute evidence that Aetna employees actually reviewed Dr. Kincaid's report, however.

Aetna also cites to a note prepared by Kay Bryant – one of Aetna's appeal specialists – after Bryant spoke to Plaintiff's attorney about Plaintiff's appeal on December 1, 2015. (Id. (citing AR at 512-15)) The note states that Plaintiff's attorney "feels that [the] voc[ational] assessment completed for his client's own occ[upation] is flawed and should be compared to that of a Controller . . . as not[ed] in the voc[ational] eval[uation] from Charles Kincaid." (AR at 515) Bryant's note does not demonstrate, however, that either she or another Aetna employee reviewed Dr. Kincaid's report. Moreover, Aetna employee Ana Molina – and not Bryant – rendered the decision denying Plaintiff's administrative appeal (id. at 262-64), and there is no evidence that Bryant ever discussed the case with Molina. Accordingly, Bryant's note is not proof that Aetna considered Dr. Kincaid's report. See Schuman, 2017 WL 1053853,

27

at *16 (the administrator "bear[s] the burden to show that . . . that the appellate reviewer [] consider[ed]" the materials submitted by the plaintiff).

Aetna next claims that its December 17, 2015 referral of Plaintiff's appeal for further vocational review, and the December 18, 2015 evaluation by Aetna's vocational consultant Janet Clifton, demonstrate that Dr. Kincaid's report was considered. (Def. Opp. (Dkt. No. 44) (citing AR 519-21)) Clifton's December 18, 2015 report indicates only that she reviewed the job description provided with Plaintiff's application for LTD benefits, however. (Compare AR at 521 ("Referral source requested that [I] review the DIRECTOR OF ACQUISIT[IO]NS position as per job duties submitted by [Plaintiff] . . . . The job duties as outlined in that document are: Prepares, conducts and consolidates market research on potential business segments as directed by the Group CEO and principle Group Shareholder. Financial & commercial assessment of potential business opportunities for the Latium USA Group. Perform/ manage due diligence process on acquisitions identified and opportunities as they arise. General financial related duties.") with id. at 981 (Plaintiff's application describing his duties as Director of Acquisitions, which uses the same language)) Because Clifton's report says nothing about Dr. Kincaid's report, it does not establish that Aetna took Dr. Kincaid's report into account.

Aetna argues, however, that Section § 2560.503-1(h) was satisfied, because "Dr. Veneziano's January 18, 2016 peer review report specifically noted the Kincaid report as being one of the documents he reviewed." (Def. Opp. (Dkt. No. 44) at 12 (citing AR at 630)) This argument is not persuasive. Peer review reports prepared by consulting physicians are "intended to evaluate the medical evidence of [a plaintiff's] disability," not to evaluate "prior assessments of [the plaintiff's] transferrable skills and specific employment prospects." Schuman, 2017 WL 1053853, at *16. "Accordingly, it would be wholly unreasonable for [Aetna's] appellate

28

reviewer to rely on [Dr. Veneziano's] assessment of [Dr. Kincaid's report] in order to determine whether its critique of the initial vocational assessment was valid." Id. at *16, 18 (concluding that appellate reviewer's failure to consider vocational assessment submitted by plaintiff was one of several violations "sufficient under Halo to trigger de novo review").

Finally, Aetna cites its February 11, 2016 letter denying Plaintiff's appeal, which states that Aetna's "review included all of the information included in [Plaintiff's] claim and appeal file," even though "not every piece of information is specifically referenced in th[e] letter." (Def. Opp. (Dkt. No. 44) at 12 (citing AR at 262)) This conclusory statement proves nothing about whether Aetna actually reviewed Dr. Kincaid's report, however. A contrary ruling would render Section 2560.503-1(h)(2)(iv) meaningless.

The Court concludes that Aetna has not demonstrated that it took Dr. Kincaid's report "into account" in its decision-making process, nor has it demonstrated that its failure to do so was inadvertent and harmless. Accordingly, Aetna's violation of 29 C.F.R. § 2560.503-1(h) also requires the application of de novo review.[5]

## C. *De Novo* Review of ERISA Claims

"Under the de novo standard of review, the Court reviews 'all aspects of the denial of an ERISA claim, including fact issues.'" Tedesco v. I.B.E.W. Local 1249 Ins. Fund,

---

[5] Aetna's citation to Tietjen v. Unum Life Ins. Co. of Am., No. 16-CV-7021 (JMF), 2017 WL 4286317, at *3 (S.D.N.Y. Sept. 26, 2017), for the proposition that ERISA regulations "only require[] [an] administrator to establish [administrative] processes and safeguards" (Def. Opp. (Dkt. No. 44) at 12), is entirely misplaced. The issue in Tietjen was whether the plan administrator violated "29 C.F.R. § 2560.503-1(b)(5), which requires that an insurer provide 'administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions are applied consistently with respect to similarly situated claimants.'" Id. Here, Plaintiff does not contend that Aetna failed to establish or comply with its own administrative processes and safeguards. Accordingly, Tietjen is inapposite.

No. 14-CV-3367 (KBF), 2017 WL 3608246, at \*6 (S.D.N.Y. Aug. 21, 2017) (quoting <u>Kinstler v.</u> <u>First Reliance Standard Life Ins. Co.</u>, 181 F.3d 243, 245 (2d Cir. 1999)). "Furthermore, in conducting a <u>de novo</u> review, the Court gives no deference to the insurer's interpretation of the plan documents, its analysis of the medical record, or its conclusion regarding the merits of the plaintiff's benefits claim." <u>Id.</u> (internal quotation marks and citations omitted). "Rather, [under] <u>de novo</u> review, the Court stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that []he is entitled to benefits under the plan." <u>Id.</u> (internal quotation marks and citations omitted); <u>see also</u> <u>Critchlow v. First Unum Life Ins. Co. of Am.</u>, 378 F.3d 246, 256–57 (2d Cir. 2004) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies, and these principles too are applicable in ERISA cases.") (internal quotation marks and citations omitted).

   In conducting <u>de novo</u> review, a court must be "mindful of the Second Circuit's teaching that it is inappropriate for a court to grant summary judgment where the resolution of an ERISA benefits dispute entails adopting one medical expert's opinion over another's." <u>Tretola</u> <u>v. First Unum Life Ins. Co.</u>, No. 13 CIV. 231 PAE, 2015 WL 509288, at \*23 (S.D.N.Y. Feb. 6, 2015) (citing <u>Napoli v. First Unum Life Ins. Co.</u>, 78 F. App'x. 787, 789 (2d Cir. 2003) ("Such a credibility determination is appropriate at a trial, but it exceeds the scope of a judge's authority in considering a summary judgment motion.")). "Accordingly, in considering each of [the claimant's] conditions, the Court [must] inquire[] whether the evidence in the administrative record as to that condition is sufficient to support (1) [the claimant]'s position and (2) [the

30

administrator's]." Id. "Where the evidence would support a finding in either direction, summary judgment is inappropriate, and a trial must be held to permit the Court to weigh the competing positions, with due attention given to witness credibility."[6] Id.

## III.  WHETHER PLAINTIFF IS "DISABLED" WITHIN THE MEANING OF THE PLAN

The parties dispute whether Plaintiff has proven that he is "disabled" within the meaning of the Plan. As discussed above, the Plan provides that an individual is disabled when (1) he "cannot perform the material duties of [his] own occupation solely because of an illness [or] injury"; and (2) his "earnings are 80% or less of [his] adjusted predisability earnings." (AR at 1025) It is undisputed that Plaintiff's earnings after the onset date of his alleged disability – November 3, 2014 – are 80% or less of his adjusted earnings before that date. (See id. at 969) Accordingly, the only issue is whether Plaintiff is unable to "perform the material duties of [his] own occupation solely because of an illness or injury." (Id. at 1025)

The Plan defines "Own Occupation" as the occupation that the claimant was performing when his "period of disability" began, "viewed as it is normally performed in the national economy," rather than how it was performed for the claimant's specific employer. (AR at 1041) The Plan defines "Material Duties" as duties that "[a]re normally needed for the

---

[6] Aetna appears to take the position that the Court should resolve factual disputes in deciding the parties' cross-motions. (Def. Reply (Dkt. No. 37) at 8 ("[I]t is not clear what [denying both motions] would accomplish, because the Court would then conduct a bench trial on the papers with the [] Court acting as the finder of fact, on the same record currently before it.")) The Second Circuit has held, however, that where "the parties did not stipulate to a 'summary trial' or a 'bench trial "on the papers,"' . . . the district court [i]s obliged to proceed in traditional summary judgment fashion." O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011); see also id. ("[I]t must be clear that the parties consent to a bench trial on the parties' submissions."). Here, the parties have not agreed to a bench trial on the papers. (Pltf. Br. (Dkt. No. 39) at 6 ("[Plaintiff] requests a bench trial to resolve any issues of disputed material fact.")) The Court must therefore proceed in "the traditional summary judgment fashion." O'Hara, 642 F.3d at 116.

performance of [the claimant's] own occupation," which "[c]annot be reasonably left out or changed." (Id.)

Here, Plaintiff was working as a Group CFO prior to the onset date of his claimed disability (id. at 714, 978), and Plaintiff contends that he is "incapable of performing the material duties of a Group CFO," because "he cannot handle[] stressful and pressure filled environments" or "extensive travel."[7] (Pltf. Br. (Dkt. No. 39) at 16) Aetna argues, however, that "the type of travel [P]laintiff allegedly needed to avoid was not a material duty of his own occupation," and that "an alleged need to 'avoid stress' cannot qualify [P]laintiff for benefits." (Def. Opp. (Dkt. No. 44) at 6)

## A.  Plaintiff's Alleged Inability to Travel

Aetna contends that Plaintiff's alleged travel restrictions cannot support a finding of disability, because extensive travel is not a material duty of his "own occupation." (Id.) Relying exclusively on Dr. Kincaid's report, Plaintiff responds that "[t]he vocational evidence [shows] that [Plaintiff]'s occupation as Group CFO as performed in the general economy . . . requires extensive travel for meetings, conferences, etc." (Pltf. Reply (Dkt. No. 46) at 11; see also Pltf. Br. (Dkt. No. 39) at 10) Dr. Kincaid's report does not establish that Plaintiff's "own occupation," as "it is normally performed in the national economy" (AR at 1041), involves travel, however – let alone extensive travel.

Dr. Kincaid opined that Plaintiff's "past work is best represented by [the occupation of] Controller," and reported that the duties of a Controller are as follows:

---

[7]  Plaintiff also contends that he is disabled because he cannot maintain a "heavy work schedule." (Plft. Br. (Dkt. No. 39) at 16) The Plan expressly provides that "be[ing] at work more than 40 hours per week is not a material duty," however. (AR at 1041) Accordingly, Plaintiff is not entitled to disability benefits based on his inability to work long hours.

Directs financial activities of organization or subdivision of organization: Prepares, using computer or calculator, or directs participation of, reports which summarize and forecast company business activity and financial position in areas of income, expenses, and earning, based on past, present, and expected operations. Directs determination of depreciation rates to apply to capital assets. Establishes, or recommends to management, major economic objectives and policies for company or subdivision. May manage accounting department. May direct preparation of budgets. May prepare reports required by regulatory agencies. May advise management on desirable operational adjustments due to tax code revisions. May arrange for audits of company accounts. May advise management about property and liability insurance coverage needed.

(Id. at 687) "Travel" is not mentioned in the summary of a Controller's duties.

Dr. Kincaid's report elsewhere states that the duties of a "Chief Executive" include "present[ing] information at meetings or conventions to promote services," and that "[m]eetings and conventions often require traveling domestically and internationally across time zones." (Id. at 684 (internal quotation marks omitted); see also id. at 672 ("According to the Occupational Outlook Handbook[,] '[t]op executives frequently travel to attend meetings and conferences or to visit their company's local, regional, national and international offices.")) Neither side contends that Plaintiff's "own occupation" was Chief Executive, however.

Although Dr. Kincaid's report notes that Plaintiff reported that "he was required to travel frequently for his work as a Group Chief Financial Officer" (id. at 684), under the terms of the Plan, Plaintiff's "own occupation" is not evaluated according to "how it [was] performed" for Plaintiff's "specific employer."[8] (Id. at 1041)

In sum, Dr. Kincaid's report does not support Plaintiff's claim that the material duties of his "own occupation" include "extensive travel." Accordingly, Plaintiff is not entitled to disability benefits based on his alleged travel restriction.

_____

[8] For this same reason, Plaintiff's description of his work (see AR at 713-20) is not probative of whether extensive travel is a material duty of his "own occupation."

33

## B. Plaintiff's Alleged Restriction on Stress

### 1. Whether A Need to Avoid Stress Can Constitute a Disability Under the Plan

As to Plaintiff's "alleged need to avoid stress," Aetna contends that it "cannot be the basis for a disability," because stress is not a "material duty" of Plaintiff's own occupation, but "[r]ather . . . one possible reaction to the need to perform a material duty." (Def. Opp. (Dkt. No. 44) at 16; see also Def. Reply (Dkt. No. 37) at 7)

The relevant inquiry is not whether stress is a material duty of Plaintiff's occupation, however. As stated above, the Plan provides that an individual meets the test for disability if he (1) "cannot perform the material duties of [his] own occupation solely because of an illness, [or] injury" and (2) is earning 80% or less of his adjusted predisability earnings. (AR at 1025) It is a well-settled principle of insurance law that an individual cannot perform "his occupation if it would be impossible for him to do so 'without hazarding his health or risking his life.'" Clarke v. Aetna Life Ins. Co., No. 04 CIV. 1440 (RJH), 2009 WL 4259980, at *21 (S.D.N.Y. Dec. 1, 2009) (quoting Napoli v. First Unum Life Ins. Co., No. 99 Civ. 1329 (GEL), 2005 WL 975873, at *7 (S.D.N.Y. April 22, 2005)); see also Lasser v. Reliance Standard Life Ins. Co., 146 F. Supp. 2d 619, 628 (D.N.J. 2001) ("It is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health."). Accordingly, "the salient question is whether [Plaintiff] suffers from such a severe, chronic susceptibility to stress that it is impossible for him to return to his old job as [Group CFO]." Clarke, 2009 WL 4259980, at *21; cf. Napoli, 78 F. App'x at 788 (holding that district court erroneously granted summary judgment where parties' experts disputed whether plaintiff – a bond trader who had a heart attack and underwent bypass surgery – could

34

return to work, in light of risk that occupational stress might trigger an acute cardiac event; remanding case for bench trial).

The cases cited by Aetna (Def. Opp. (Dkt. No. 44) at 17-18) are irrelevant, because they either involve application of the "arbitrary and capricious" standard of review[9] or bench trials at which the court was able to evaluate the credibility of the experts. See Leipzig v. AIG Life Ins. Co., 362 F.3d 406 (7th Cir. 2004) (applying arbitrary and capricious standard of review); Macri v. Aetna U.S. Healthcare, No. CV-03-3860 (CPS), 2005 WL 1475416 (E.D.N.Y. June 20, 2005) (same); Rosenthal v. First Unum Life Ins. Co., No. 00 CIV. 3204 (LMM), 2002 WL 975627, at *7 (S.D.N.Y. May 9, 2002) (same); Napoli, 2005 WL 975873 (decision issued after bench trial); Clarke, 2009 WL 4259980 (same).

Aetna argues, however, that there is no "battle of experts [here] regarding the question[] [of] whether [Plaintiff's] alleged need to avoid undue stress can be a basis for a disability," because Dr. Kincaid "agreed [with Aetna's vocational consultant] that 'stress' is a matter of perception." (Def. Reply (Dkt. No. 37) at 7 (citing AR at 683)) According to Aetna, a "duty [that] might be perceived as stressful or not stressful by different people . . . cannot be considered a material duty of an occupation in the national economy." (Def. Opp. (Dkt. No. 44) at 17) Aetna again misstates the relevant inquiry, however. The issue is whether Plaintiff is disabled as a result of his alleged inability to handle occupational stress, not whether stress itself is a material duty of his occupation.[10] Cf. Napoli, 2005 WL 975873, at *5 ("What would render

---

[9] See Sigal v. Metro. Life Ins. Co., No. 16-CV-3397 (JPO), 2018 WL 1229845, at *12 (S.D.N.Y. Mar. 5, 2018) ("[T]he Second Circuit has explained [that], when faced with a conflict between two potentially credible physician's reports, neither party is entitled to summary judgment where . . . a Plan Administrator's decision is subject to de novo review.") (citing Napoli, 78 F. App'x at 789).

[10] Moreover, Plaintiff's vocational expert has offered evidence that the duties of Plaintiff's "own occupation" are likely to involve high levels of stress. In the section of his report addressing

35

[the claimant] disabled within the meaning of the policy would be an increased risk to his health from performing his job.").

The Court concludes that the record contains evidence from which a reasonable fact finder could conclude that Plaintiff is "disabled" within the meaning of the Plan as a result of a restriction on stress.

## 2. The Competing Physicians' Opinions Preclude Summary Judgment

Plaintiff asserts that he is entitled to summary judgment because "Aetna does not dispute that [Plaintiff] is unable to handle stressful situations and environments," and "the only one of Dr. Cohen's restrictions and limitations to which Dr. Veneziano objected was [Plaintiff's] inability to tolerate extensive air travel." (Pltf. Br. (Dkt. No. 39) at 20) Neither assertion is true. Aetna has argued that the "evidence from [P]laintiff and his doctors fails to establish medical support for the claimed restrictions on stress" (Def. Opp. (Dkt. No. 44) at 13), and Dr. Veneziano challenged the opinions of Plaintiff's physicians that Plaintiff's occupational stress "hinder[ed] his symptomatic improvement and increase[d] his risk for future [cardiac] events." (AR at 632)

In his first report, Dr. Veneziano opines on Plaintiff's "functional limitations . . . based on the available medical record," and he does not include a need to avoid stress among Plaintiff's restrictions. (Id. at 633) He also opines that, "[w]hile removal of stress and devoting more time to a healthy life-style may theoretically help Mr. Aitken's cardiovascular health, based

---

"[t]he impact of stress on employability," Dr. Kincaid opined that "[t]he high stress levels and duties of [Plaintiff's] former job position are representative of CFO positions in the U.S. labor market." (Id. at 683) Dr. Kincaid also concluded that it was "within a reasonable degree of vocational certainty that [Plaintiff] was unemployable in his past work as a Group [CFO] or similar stress-producing occupation[] due to his medical restrictions." (Id. at 692) By contrast, Aetna's vocational expert Clifton reported that she "would not be able to comment on [a position's] stress level, per se, as this information would be more job-specific or employer-specific and can be subjective and not well-defined." (Id. at 487)

on his doctors' notes where Mr. Aitken consistently acknowledges he is not exercising as instructed nor losing weight as instructed, Mr. Aitken does not seem to be actually making any progress in that area." (Id. at 632) Accordingly, Dr. Veneziano is opining that the exercise and weight loss recommended by Plaintiff's physicians would likely relieve his cardiovascular symptoms.

In his second report, Dr. Veneziano opines that "there is nothing within [Dr. Cohen's responses] that supports . . . any additional restrictions beyond what was put forward in my [first report]" (id. at 608), which – again – did not include any restriction based on stress. (Id. at 633) Dr. Veneziano repeats his opinion that "weight loss and increased exercise would be expected to improve Mr. Aitken's functionality and symptoms at least as much as 'avoiding stress.'" (Id. at 608) Dr. Veneziano also notes that Plaintiff's angina occurred four months after he had left his job as CFO, "suggest[ing] that Mr. Aitken's symptoms were not, in fact, job related." (Id. at 632) Dr. Veneziano also points out that – given Dr. Cohen's statement that Plaintiff "has been 'deeply affected' by the possibility of an adverse cardiac event [due to exercise]," "the question must be raised whether [Plaintiff's] symptoms related to 'stress' . . . are more anxiety related than ischemia related." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 43) ¶ 60)

In sum, Dr. Veneziano rejects the notion that Plaintiff's cardiac symptoms arise from stress associated with his "own occupation," and he disputes Dr. Cohen's conclusion that a restriction on stress is necessary. His reports – as Plaintiff acknowledges – support Aetna's position that Plaintiff's alleged need to avoid stress does not prevent him from performing the duties of his "own occupation." (See Pltf. Opp. (Dkt. No. 42) at 8 ("Aetna's medical consultant

asserts that [Plaintiff] is not entitled to LTD benefits because his restrictions and limitations do not prevent him from performing the duties of his own occupation."))

Aetna likewise asserts that it is entitled to summary judgment, because the medical evidence does not support Plaintiff's alleged restriction on stress. (See, e.g., Def. Reply (Dkt. No. 37) at 6 ("The resolution of this action does not depend on the Court's adopting one expert's opinion over another's.") (internal quotation marks and citations omitted)) Statements from Plaintiff's treating physicians – Dr. Cohen and Dr. Gupta – provide sufficient support for Plaintiff's position, however.

In his January 23, 2015 Attending Physician's Statement, Dr. Cohen states that Plaintiff's restrictions include "no undue stress," and that "undue stress has affected his medical condition." (AR at 961) Moreover, in a November 3, 2015 letter, Dr. Cohen states that, "I have advised [Plaintiff] against . . . working [in] a high pressure environment. For his long-term cardiovascular health, it is essential that he decrease his stress levels . . . . I have therefore asked him to seek reassignment or different employment to prevent further cardiovascular illness and disability." (Id. at 662) Finally, in his February 3, 2016 response to Dr. Veneziano's report, Dr. Cohen states unequivocally that Plaintiff "cannot handle stressful or pressure filled situations[,] as these cause a significant increase in symptoms, which could result in further cardiac events. The effect of stress/pressure on [Plaintiff's] cardiac condition . . . is the main cause of his disability. . . . When [Plaintiff] was working as Group CFO, his symptoms were significantly worse, which I attribute largely to the stress of the job." (Id. at 613)

In Dr. Gupta's December 23, 2014 Attending Physician Statement, he stated that Plaintiff's restrictions included "a low stress job." (Id. at 985) And in an October 7, 2015 letter,

Dr. Gupta reported that he had "seen [Plaintiff] on October 6, 2015[,] [and] [d]ue to his recent cardiac health . . . advised him not to . . . maintain a high stress job." (Id. at 663)

Dr. Cohen and Dr. Gupta's opinions are sufficient to support Plaintiff's alleged restriction on stress.

Aetna argues, however, that the Court should not consider Dr. Cohen and Dr. Gupta's statements, because they were made after Plaintiff changed jobs and filed his disability claim. (See, e.g., Def. Reply (Dkt. No. 37) at 6 ("[W]hat [Plaintiff's] doctors said months later when they were asked to support [P]laintiff's disability claim . . . does not create a situation where the Court must choose between [P]laintiff's experts and Aetna's experts. Instead, the Court merely needs to consider whether the contemporaneous medical records, or later statements of advocacy, are better indicators of [P]laintiff's condition when he changed jobs."))[11] The timing of the doctors' statements that Plaintiff needs to avoid stress may undermine their credibility, but does not justify rejecting their assessments outright. See McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 136-37 (2d Cir. 2008) (concluding that plan administrator's determination was arbitrary and capricious where it "seized upon" a "physician's earlier letter indicating that [plaintiff] was only restricted from extreme workload and physical exertion" and "ignored" a memorandum that plaintiff submitted with his appeal, which reported more "severe limitations and conditions" and "which [the plaintiff's] physician later confirmed as accurate"; explaining that the "wholesale embrace of one medical report to the detriment of a contrary report that favors granting benefits . . . [is] indicative of an [] abuse of discretion").

---

[11] Aetna also asserts that "Plaintiff's affidavit made clear that the decision to change jobs was made by him, not his doctors." (Def. Br. (Dkt. No. 35) at 12 (citing AR at 718); see also Def. Opp. (Dkt. No. 44) at 14)  Plaintiff's affidavit is silent on this point, however.

Moreover, and contrary to Aetna's suggestion (Def. Reply (Dkt. No. 37) at 9), this is not a case in which Plaintiff's "physicians did not, during or close to the relevant period, find that [Plaintiff's need to avoid stress] was a disabling condition." Tretola, 2015 WL 509288, at *29 (emphasis added). Plaintiff claimed that he became disabled on November 3, 2014, and both Dr. Gupta and Dr. Cohen stated within the next three months – on December 23, 2014 and January 23, 2015, respectively – that Plaintiff's restrictions included low stress. (AR at 961, 985) Likewise, the fact that Dr. Cohen and Dr. Gupta did not assess Plaintiff's functional restrictions in contemporaneous treatment notes does not compel the conclusion that Plaintiff is not disabled, because treatment notes are not prepared in anticipation of insurance litigation. See Streit v. Guardian Life Ins. Co. of Am., 374 F. Supp. 2d 1109, 1115 (M.D. Fla. 2005) (concluding that "[a]ny conceivable weight that can be attributed to a doctor's failure to address the effect his patient's symptoms have on the patient's ability to work [in contemporaneous medical records] is surely superceded by an unequivocal letter [from] the doctor stating [that] the patient is unable to work"; reasoning that "[d]octors are not in the business of insurance, [so] a false implication is not warranted when a treating physician fails to comment in his medical records that a patient is disabled"), aff'd, 188 F. App'x 915 (11th Cir. 2006); cf. Brownawell v. Comm'r Of Soc. Sec., 554 F.3d 352, 356 (3d Cir. 2008) (observing that, in social security cases, which similarly require an assessment of a claimant's functional capacity, "this Court has admonished ALJs who have [failed to] not[e] the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work"); Orn v. Astrue, 495 F.3d 625, 634 (9th Cir. 2007) ("The primary function of medical records is to promote communication and recordkeeping for health care personnel – not to provide evidence for disability determinations.").

40

In sum, determining whether Plaintiff is disabled based on his alleged need to avoid stress will require weighing physicians' competing opinions. Accordingly, neither side is entitled to summary judgment. See Sigal v. Metro. Life Ins. Co., No. 16-CV-3397 (JPO), 2018 WL 1229845, at *12 (S.D.N.Y. Mar. 5, 2018) ("[W]hen faced with a conflict between two potentially credible physician's reports, neither party is entitled to summary judgment.").

## CONCLUSION

For the reasons stated above, the parties' cross-motions for summary judgment are denied. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 33, 38) The parties will file a joint letter by October 7, 2018, indicating how they wish to proceed.

Dated: New York, New York
September 25, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

41